WILMAR OIL, INC., *et al.*, Plaintiffs-Appellants, *v.* ALAN J. DIXON, Secretary of State, Defendant-Appellee.

Fourth District    No. 16333

Opinion filed November 12, 1980.—Rehearing denied December 11, 1980.

Harlan Heller, of Harlan Heller, Ltd., of Mattoon, for appellants.

Tyrone C. Fahner, Attorney General, of Chicago (Karen Konieczny, Assistant Attorney General, of counsel), for appellee.

Mr. JUSTICE GREEN delivered the opinion of the court:

This case concerns: (1) section 5 of the Illinois Securities Law of 1953 (Ill. Rev. Stat. 1975, ch. 121½, par. 137.5) which requires all nonexempt transactions to be registered with the Secretary of State; (2) section 4H of the Act (Ill. Rev. Stat. 1975, ch. 121½, par. 137.4H) which denies exemption to all transactions involving sales of "fractional undivided interests in an oil, gas, or other mineral lease, right or royalty for the direct or indirect benefit of the issuer thereof * * *" if commissions exceeding 15% of initial offering price of the securities are paid; and (3) section 11(H) of the Act (Ill. Rev. Stat. 1975, ch. 121½, par. 137.11(H)), which authorizes the Secretary to (a) order the suspension or prohibition of any sale of securities, with exceptions not applicable here, if the sale is "fraudulent, inequitable or would work or tend to work a fraud or deceit," and (b) prohibit or suspend any person from selling securities in the State when that person has previously sold securities without complying with the registration requirement of the Act.

On October 28, 1975, after a hearing upon notice, defendant, the Secretary of State, State of Illinois, issued an order prohibiting plaintiffs, Wilmar Oil, Inc., Wilmar Petroleum Corp., and William ZuHone, Jr., from selling the securities in question here and any other securities in the State of Illinois. On December 1, 1975, plaintiffs filed a complaint for administrative review of the above order in the circuit court of Coles County. The circuit court affirmed the Secretary on May 8, 1980. Plaintiffs appeal claiming: (1) the conduct of the administrative proceedings denied them due process of law; and (2) the determination of the Secretary was contrary to the manifest weight of the evidence.

The parties stipulated that plaintiffs received written notice of the hearing before the Secretary. It clearly advised plaintiffs that their privilege of selling securities within the State might be taken from them. However, they complain that they were misled by a statement given them by the hearing officer. The record shows that plaintiffs' counsel asked if the Secretary was attempting to obtain a cease and desist order and the officer replied that the order would be a prohibition order prohibiting them from operating in the manner in which they had been

doing. He stated that it would not prohibit them from selling although they could not continue to sell as before.

■■ The test of whether notice is adequate is whether the party receiving notice should have anticipated the effects and orders possible. (*Department of Revenue v. Jamb Discount* (1973), 13 Ill. App. 3d 430, 301 N.E.2d 23.) The original notice satisfied that requirement. Plaintiffs made no showing that the later statement of the hearing officer caused them to change their tactics at the hearing or to withhold any evidence. In the absence of a showing of detrimental reliance, we do not find plaintiffs to have been denied due process.

Documentary evidence produced at the administrative hearing undisputedly showed that Wilmar Petroleum Corp. and Wilmar Oil, Inc., were offerors of fractional interests in oil and gas wells. Two wells were involved in this case: #1 R. S. Barnett, a gas-producing well in Palo Pinto County, Texas, and the Gregory #1, a producing oil well in Coal County, Oklahoma. Sales of fractional interests in both wells were made to Illinois residents. William ZuHone, Jr., was the president and owner of Wilmar Oil, Inc., and Wilmar Petroleum Corp. The operation of the two companies was interwoven.

The sale of the interests was structured as follows: As to the Gregory #1 lease, ZuHone initially invested $8000 for the purchase of the lease. The cost of drilling that well to the casing point was estimated by plaintiffs to be $55,003.91. The size of the smallest fractional interest was 1/64th, at a price of $1574.25, and 40/64ths interest were offered and sold, for a total of $62,970 received from investors. The price of each 1/64th interest was a fixed apportionment of the estimated cost price of drilling the well to the casing point.

Purchasers of the fractional interests were required to agree to invest an additional fixed cost of $1390.50 per 1/64th interest if, after reaching the casing point, the offerors were of the opinion that the well could produce oil and gas in commercial quantities. If they did not invest this additional amount, the purchasers would forfeit their interest. 20/64ths interests were retained by the offeror, a value of $31,485. Sales commissions amounting to 4/64ths interests in the well were paid. The offeror's retained interests and the fractional interests reserved for sales commissions were not subject to completion costs.

Upon reaching the casing point, the offerors deemed the well to be able to produce in commercial quantities. They then received from the investors an additional $55,660. The cost of completing the well for production was $38,863.79. Cash sales commissions amounting to $7084.13 were paid for the drilling of the well. Administrative and overhead expenses were $1500. The costs to plaintiffs totalled $210,451.83, and the

investment from the purchasers totalled $118,630, a difference of $91,821.83.

The #1 R. S. Barnett well was structured in the same way the Gregory #1 well was structured. The cost of the #1 R. S. Barnett lease was $4615. The smallest fractional interest was 1/64th, and 40/64ths interests were offered to the public with 20/64ths interests retained by the offeror and 4/64ths interests retained to be given away as sales commissions. The retained 24/64ths interests were not subject to any drilling or completion costs. Each 1/64th interest sold for $2198.50, and all 40 interests were sold for a total investment of $87,940. The price of each interest was a fixed apportionment of the estimated cost of drilling the well to the casing point. The purchasers of the fractional interests were required to agree to invest an additional fixed cost of completion of $2091.50 per 1/64th interest if the well was commercial. The total amount received from the investors for the completion of the well was $83,660.

The hearing officer found that as to both wells, the commissions received exceeded the 15% of the initial offering price allowed under section 4H of the Act and therefore plaintiffs violated section 12A of the Act (Ill. Rev. Stat. 1975, ch. 121½, par. 137.12A) by selling nonexempt securities in a transaction not exempt from registration requirements.

The hearing officer further found that the sale of the securities violated section 12A and F of the Act in that the securities were so structured as to be inequitable and tended to work a fraud or deceit on the public. The recommendation of the hearing officer was adopted by the Secretary, who then issued an order prohibiting plaintiffs from selling any securities within the State of Illinois.

■■ Contrary to the findings of fact plaintiffs did not pay commissions in excess of 15% of the initial offering price in regard to the #1 R. S. Barnett lease. No cash commissions were paid and the only commission paid was the 4/64ths working interest which was valued at $8794 and was paid to salesmen. The total offering price for the 40/64ths working interests which were sold to the public was $87,940. Thus the commission had a value of 10% of the total offering price. However, as to the Gregory #1 lease, a cash commission of $7084.13 was paid and 4/64ths working interest in the Gregory lease valued at $6297 was given to salesmen as commissions, for a total of $13,381.13 in commissions. The percentage of the commissions paid of the initial sales price is 21.25%. Because the commissions paid in this transaction exceed the 15% ceiling of section 4H, plaintiffs were shown to have sold unregistered securities in a transaction not exempt from registration. The Secretary's determination to invoke his power under section 4H and prohibit further sales of securities in the State was not contrary to the manifest weight of the evidence.

■■ No evidence of fraud or deceit in the offering or selling of the securities was presented as complete details of the structure of the offering was given to the purchasers, but substantial evidence was presented that the structure was inequitable. Plaintiffs retained (1) an overriding royalty of 1/8th of 7/8ths in each well, (2) reservation of all rights in the well lower than 50 feet below the depth of the drilling, and (3) 20/64ths of the working interest. Based upon their projected costs of drilling they would have made a profit of $14,024.50 on the Gregory #1 lease and $35,134 on the #1 R. S. Barnett lease even if dry holes had been drilled. Actually the costs of drilling and completion on the Gregory #1 lease greatly exceeded estimates and plaintiffs were required to contribute $90,321.83 to complete that project. The final figures were not complete as to the #1 R. S. Barnett lease. In any event, plaintiffs retained for themselves 34.17% of the total production on the Gregory #1 lease and 39.6484% of the production on the #1 R. S. Barnett lease. When dealing with matters as uncertain as drilling for oil, it is difficult to determine whether the structure of proposed financing is equitable to investors. However, upon the basis of the evidence here, we do not deem the Secretary's determination that the structures here were inequitable to be contrary to the manifest weight of the evidence.

For the reasons stated we affirm the order of the circuit court affirming the action of the Secretary of State.

Affirmed.

CRAVEN and WEBBER, JJ., concur.